UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-14068-CR-CANNON/MAYNARD

UNITED STATES OF AMERICA

v.

CHRISTOPHER JON BAUER,

                    **Defendant.**

_____/

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR DOWNWARD VARIANCE**

    Comes now the United States of America, by and through the undersigned Assistant United States Attorney, and hereby responds in opposition to the defendant's motion for downward variance, moves this Honorable Court to deny the defendant's motion, and impose a sentence of 130 months' imprisonment.

**BACKGROUND**

    On July 18, 2022, the Sebastian Police department initiated an investigation into an anonymous tip that a Brevard County resident was importing and distributing fentanyl from his residence (PSI ¶ 6). After conducting preliminary surveillance, Detective (Det.) Bryan Melius of the Sebastian Police Department conducted surveillance at 317 Sea Grape Avenue in response to the tip (PSI ¶ 7).

    Then, on August 31, 2022, the Postmaster for the Sebastian Post Office alerted Special Agent (SA) David Catalano of the Department of Homeland Security, Homeland Security Investigations (HSI), that a package addressed to "Brittany Barber," arrived at the post office (PSI ¶ 9). Det. Melius and SA Catalano set up surveillance at the United States Post Office, located at

1

1290 Main Street, Sebastian, Florida (id.).  SA Catalano and Det. Melius witnessed a red Cadillac SUV, driven by the defendant with co-defendant Durkin in the passenger seat, arrive at the post office (id.).  Upon arrival, Durkin exited the Cadillac and walked into the Post Office, returning a short time later with a USPS Express package (PSI ¶ 10).  After Durkin re-entered the Cadillac, Det. Melius watched the Cadillac pull up to a GMC pickup truck that was also in the post office parking lot (id.).  Durkin again exited the Cadillac, conducted what Det. Melius recognized, based on his training and experience, to be a hand-to-hand drug transaction, and then re-entered the Cadillac (id.). As the defendant drove the Cadillac out of the parking lot, Det. Melius and SA Catalano could see that neither occupant was wearing their seatbelt (id.).

   Det. Melius notified marked units in the area of his observations and K9 Officer Irwin and K9 Officer Revis located the Cadillac.[1]  Officer Irwin also observed that neither occupant was wearing their seatbelt as they traveled east on Main Street.  Officer Irwin activated his emergency lights to conduct a traffic stop, and the defendant turned on his right turn signal, turning right onto Cross Street (PSI ¶ 11).  Rather than stopping, the defendant accelerated, causing his rear suspension to compress, alerting Officer Irwin that the defendant was attempting to flee.  The defendant then turned right on Palmetto Avenue, failing to stop at the stop sign and stop bar, prior to making a righthand turn, in violation of Florida Statute 316.123(2)(a).  Officer Irwin activated his sirens, in a further attempt to stop the defendant, but he continued driving.  The defendant then activated his brakes, drawing Officer Irwin closer to his vehicle, and after releasing the brakes, he abruptly applied the brakes again, in an apparent attempt to stop the pursuit by brake checking Officer Irwin (id.).  As a result, Officer Irwin collided with the back of the defendant's vehicle,

---

[1] Both Officers Irwin and Revis were driving marked police vehicles, equipped with a front push bar, lights, sirens, and "Sebastian Police" markings.

thereafter, pushing it forward in an attempt to end the pursuit (id.). Despite these efforts, the defendant continued his flight, making a left turn onto Main Street, which caused a black Dodge Journey to apply its brakes. The defendant accelerated to at least 70 mph, in a 30-mph zone, moving into the opposite lane of traffic to pass slower vehicles. At no point after the collision, did the defendant attempt to stop and remain at the scene of the crash.

Eventually, Officer Irwin caught up to the defendant and attempted a PIT[2] maneuver to stop the vehicle (PSI ¶ 11). That maneuver damaged the front left suspension of the defendant's vehicle, but he continued to flee (id.). Officer Irwin attempted a second PIT maneuver, spinning the vehicle in the opposite direction, which allowed Officer Revis to pin the defendant's vehicle between his police vehicle and Officer Irwin's police vehicle. Even after this second PIT maneuver, the defendant continued his attempt to flee, accelerating forward to the point that the right rear wheel of his vehicle was spinning and generating smoke, as recorded by Officer Revis's in-car camera.

During the stop and ultimate arrest, officers located a black bag on the ground next to the driver's side of the vehicle (PSI ¶ 13). They collected the bag as evidence, and discovered that it contained approximately 57 grams of fentanyl (PSI ¶ 17). During a search incident to arrest, they located a small amount of cocaine in the defendant's front left pants pocket (PSI ¶ 15). In addition to the drugs found on or near the defendant, they also located approximately 4.5 grams of fentanyl in the vehicle, and approximately 12.6 grams of methamphetamine on the driver's side floorboard of the Cadillac, during an inventory search (PSI ¶¶ 12, 13).

---

[2] "PIT" maneuver stands for pursuit intervention technique.

Post-*Miranda*, Durkin admitted to receiving 16 packages in the mail, which she admitted contained fentanyl (PSI ¶ 16). She further explained that the defendant purchased the fentanyl on the dark web using a laptop computer, and that he would cut the fentanyl with other substances and sell the mixture as heroin (PSI ¶ 18). She went on to explain that he stored the drugs in his garage, and that she consumed some of the product, personally verifying that the mixture was in fact, narcotics.

On October 31, 2022, the Court issued a criminal complaint, charging the defendant with possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and conspiracy to possess with intent to distribute a controlled substance, in violation of Title 21, Section 846 (ECF No. 3). The defendant was arrested on November 2, 2022, and on November 17, 2022, a federal grand jury sitting in the Southern District of Florida returned a three-count indictment against the defendant, charging him with one count of conspiracy to possess with intent to distribute a controlled substance, in violation of Title 21, Section 846 and two counts of possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) (ECF No. 16).

On March 8, 2023, the defendant pleaded guilty to counts two and three of the Indictment pursuant to a written plea agreement with the United States (ECF Nos. 89-91).

The defendant's sentencing hearing is scheduled for May 22, 2023. According to the Presentence Investigation Report ("PSI"), The defendant has a total offense level of 27 and criminal history category of VI, which yields an advisory sentencing guideline range of 130-162 months' imprisonment (PSI ¶¶ 41, 61, 115). The defendant would ordinarily be subject to a mandatory minimum sentence of 5 years' imprisonment, but he is eligible for safety-valve relief. (ECF No. 116-1). Thus, the Court may sentence the defendant without regard to the otherwise

applicable mandatory minimum. When the additional two-level safety-valve reduction is applied, pursuant to §2D1.1(b)(18) and §5C1.2, the defendant's total offense level is 25, producing a guideline range of 110 to 137 months (ECF No. 116-1).

On May 18, 2023, the defendant filed a sentencing memorandum and motion for downward variance (ECF No. 124), and on May 20, 2023, the defendant filed an amended sentencing memorandum and motion for downward variance (ECF No. 127).

## ANALYSIS

### A. The § 3553(a) factors do not support a downward variance.

When sentencing a defendant, the Court is required to "impose a sentence sufficient, but not greater than necessary" that complies with the purposes of the statute and takes into consideration the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence to reflect the seriousness of the offense, promote respect for the law, to provide just punishment, to afford adequate deterrence, to protect the public, to provide the defendant with adequate services, and which considers the kinds of sentences available, the sentencing ranges, pertinent policy, the need to avoid unwarranted sentencing disparities, and to provide restitution. 18 U.S.C. § 3553(a).

### i. Nature and Circumstances of the Offense

The nature and circumstances of the defendant's offense conduct in this case demonstrate the danger the defendant posed to the community, and a selfishness on par with the most serious of felonies, due to the dangers of fentanyl, and the defendant's role in sourcing, purchasing, concealing, preparing, and distributing such a deadly product to the Sebastian community.

The defendant is responsible for between 280 and 400 grams of fentanyl crossing the United States from California to Florida, and entering the Sebastian community. Fentanyl is an

5

incredibly dangerous drug, responsible for more deaths of Americans under the age of 50 than any cause of death, including heart disease, cancer, homicide, suicide, and other accidents.[3] Of the 107,375 overdose deaths from February 2021, through January 2022, 67 percent involved synthetic opioids like fentanyl.[4] Fentanyl is a powerful drug, strong enough to kill a person with only two milligrams of the substance.[5] Drug traffickers ignore these risks, choosing to manufacture a product using fentanyl in an uncontrolled, non-scientific environment, with no ability to guarantee that the resultant mixture they sell will not kill their customers.

The defendant is one such drug trafficker who prioritized his own interests at the expense of his neighbors. By importing such a large quantity of fentanyl, preparing it for sale, and then distributing it to the Sebastian community, the defendant negatively impacted thousands of lives; at best perpetuating addiction, and at worst, contributing to their untimely death.

The defendant's conduct also suggests that he was not tangentially involved in the conspiracy, but a central participant who dedicated a significant portion of his time and effort to learning about the steps required to obtain, prepare, and distribute fentanyl. First, the defendant did not rely on the local drug trade to source his fentanyl. Instead, he learned to use the dark web, which requires a reasonable amount of technological understanding, beyond the average computer or internet user. After learning to use the dark web, the defendant located a source of supply, made the necessary connections to establish trust with the seller, and began purchasing large quantities of fentanyl. Rather than ship the fentanyl directly to his home, the defendant used friends, neighbors, and his girlfriend, as recipients to mask the true destination of the drugs in the

---

[3] Drug Enforcement Administration, https://www.dea.gov/fentanylawareness (May 19, 2023).
[4] Drug Enforcement Administration, https://www.dea.gov/fentanylawareness (May 19, 2023).
[5] Drug Enforcement Administration, https://www.dea.gov/fentanylawareness (May 19, 2023).

event his shipments were discovered by law enforcement. Then, he cut the fentanyl, mixing it with other substances, as evidenced by the drug preparation paraphernalia found during a search of his residence. Finally, the defendant sold the resultant product as heroin.

Oftentimes, each of the individual acts described above are completed by a different person in a drug trafficking conspiracy, but here, the defendant performed them all. Nor was this an act of convenience, where a drug user employs his or her contacts to source and distribute illegal drugs. Here, the nature and circumstances of the defendant's conduct suggest that the defendant was deeply invested in this drug trafficking scheme, and that he was not a casual drug dealer funding a drug addiction. Nor does such a scheme lend itself to a person overcome by addiction. The defendant's actions required planning, diligence, and expertise, traits atypical of a person addicted to heroin or fentanyl.

The defendant's conduct demonstrates that he is a knowing and intentional drug dealer, who went to great lengths to source, import, and conceal fentanyl that he would later distribute. Whether the defendant was motivated by money or addiction is of no moment, as his actions suggest that he was a sophisticated actor, capable of sourcing, preparing, and selling an extremely dangerous drug, and who ignored the consequences of his actions either to get rich, or to get high.

    **ii.**    **History and characteristics of the defendant.**

The defendant received numerous opportunities over a period of 28 years to reform his conduct, but in each instance, he refused to do so. This conspiracy to distribute fentanyl is yet another example of a choice in which the defendant prioritized his own needs above the law, and above the well-being of those around him.

From his very first adult charge, the defendant failed to take advantage of the second chances he received. The defendant began his adult criminal career in 1994 at the age of 16 with

7

a charge of reckless driving, and he received six months' probation. He violated his probation by failing to complete court ordered weekend work.  After a driving offense in 1994, in 1996, the defendant pled to two counts of attempted unlawful possession of a controlled substance and was sentenced to one year probation, which he again violated.  In 1997, the defendant received a third chance, receiving a sentence of time served and one year probation for possession of lorazepam, marijuana, and for two counts of failure to appear.  Once again, the defendant violated his probation.

Then in 2000, the defendant received his first serious sentence: eight years' imprisonment followed by two years' probation for burglary of a dwelling with assault or battery, and sexual battery on a person over 12 years old.  Despite this serious sentence, upon release from prison the defendant violated his probation twice, with one violation for a new battery offense.  As a result, the defendant received a 137.25-month sentence in prison, with credit for 293 days plus all time previously served in prison.  Two years after his release, the defendant committed a burglary of an occupied dwelling and a grand theft from a dwelling, and was sentenced to two years in prison. Less than a year after his release, the defendant committed several drug possession offenses, including possession of a controlled substance with intent to sell.  He was sentenced to 36 months in prison, and released on July 11, 2021.  Approximately one year later, the defendant committed the instant offense.

While the defendant will likely argue that his criminal history is the product of drug dependence, the fact remains that the defendant had at least six different opportunities, and 28 years, to seek treatment for substance abuse, either while in custody or while on probation.  Yet he failed to do so.  Instead, the defendant displayed a pattern of escalating conduct, beginning with traffic offenses, moving on to drug offenses, and graduating to property crimes and crimes of

violence, of which one involved the sexual abuse of a person with decreased cognitive abilities. At this point, the defendant received his first serious sentence, which should have served as a wake up call to reform his conduct. But the defendant persisted, violating the terms of his release by committing misdemeanor battery, and thereafter, continuing to possess drugs and commit property crimes, in spite of a series of prison sentences.

While the defendant's history of abuse and drug use is unfortunate, it does not absolve the defendant of his actions, nor serve as a basis for a downward variance. According to Dr. Michael Brannon's psychological evaluation of the defendant, the defendant suffers from a series of drug and alcohol disorders, depression, anxiety, and antisocial personality disorders. However, Dr. Brannon does not conclude that any of the defendant's ailments prevented him from appreciating the nature of his conduct or the consequences of his actions. Dr. Brannon made several treatment recommendations for the defendant, but he did not conclude that incarceration was inappropriate. Additionally, during his interview with Dr. Brannon, the defendant admitted that he last held a full-time job in 2016, and that he was fired from several jobs, but did not receive social security disability or unemployment benefits. This statement undercuts the defendant's claim that he did not profit from his drug trafficking activities, as these candid statements suggest that the defendant had no other means of income to support himself and maintain his home beyond the sale of drugs.

Therefore, by his own conduct, the defendant demonstrated that he is unwilling to follow the law, and the complexity of the instant offense supports such a conclusion. Purchasing fentanyl on the dark web, importing it to Florida, concealing the shipments, cutting and preparing the fentanyl for sale, and distributing the fentanyl, is not a simple act, but requires diligence and planning. Therefore, any suggestion that the defendant was unable to seek treatment is not supported by the evidence, as he demonstrated that he was capable of operating a complex drug

trafficking conspiracy. The defendant's prior criminal history properly enhances his guideline score range, accounting for the numerous squandered opportunities, and the knowing and intentional nature of his conduct.

### iii. Promote respect for the law, provide just punishment, and avoid sentencing disparities.

In light of the seriousness of the defendant's conduct, and his knowing participation in a scheme with life and death consequences, it is essential that any sentence account for the conscious, knowing choice the defendant made when he engaged in this fentanyl trafficking conspiracy.

The defendant's substantial criminal history suggests that any sentence in this case must be sufficiently serious to promote a respect for the law, acknowledging that each of the defendant's prior sentences has failed to do so. The defendant must also account for the damage he caused to the Sebastian community by importing fentanyl, a deadly substance.[6] As noted above, fentanyl is an incredibly dangerous substance, which can kill a person with a dose as small as two milligrams.[7] This lethality is significant because it emphasizes the danger of preparing a fentanyl mixture in a non-laboratory setting. The defendant is not a chemist or pharmacist who carefully mixed fentanyl with other inert substances, ensuring that the resultant product was a consistent, homogeneous mixture. Rather, he prepared the fentanyl in his home, using his limited knowledge as a drug user. This created a product that was extraordinarily dangerous, because a street-level user must rely on the defendant's limited chemistry ability to ensure that the resultant mixture did not contain disproportionate amounts of fentanyl that could lead to a lethal overdose. This was

---

[6] As noted previously, fentanyl is responsible for more deaths of Americans under the age of 50 than any cause of death, including heart disease, cancer, homicide, suicide, and other accidents (Drug Enforcement Administration, https://www.dea.gov/fentanylawareness (May 19, 2023)).
[7] Drug Enforcement Administration, https://www.dea.gov/resources/facts-about-fentanyl (May 19, 2023).

an acceptable risk to the defendant, but one that could have easily contributed to the dire statistics of fentanyl overdoses each year in the United States. The sentence in this case must balance these collateral risks borne by the Sebastian community that the defendant chose to ignore, in order to send a message that there are real costs to trafficking in dangerous, illegal, substances. Specifically, a prison sentence of 130 months is sufficient, but not greater than necessary, to account for the danger of the defendant's actions, and to send a message to the community that trafficking in fentanyl will not be tolerated.

Such a sentence is sufficient, but certainly not greater than necessary to comply with the 3553(a) factors, and is consistent with other sentences for defendants with similar criminal histories. By way of comparison, the United States offers the following cases involving defendants convicted of drug trafficking offenses for the Court's consideration. *See United States v. Leon McNeil Roberts*, 21-CR-14005 (S.D. Fla.) (defendant sentenced to 120 months' imprisonment for distribution of methamphetamine; defendant was accountable for 82.94 grams of methamphetamine (actual)); *United States v. Samuel Martinez*, 19-CR-14022 (S.D. Fla.) (defendant sentenced to 18 years' imprisonment for possession with intent to distribute methamphetamine and possession of a firearm in furtherance of a drug trafficking crime; defendant was accountable for approximately 1.5 kilos of methamphetamine); *United States v. Peck*, 22-CR-80100 (S.D. Fla.) (defendant sentenced to 192 months for conspiracy to possess with intent to distribute 50 grams or more of methamphetamine, 400 grams or more of fentanyl, and 100 grams or more of heroin); *United States v. Vega*, 21-CR-14030 (S.D. Fla.) (defendant sentenced to 125 months for distribution of 50 grams or more of methamphetamine, distribution of methamphetamine, and distribution of fentanyl). It should be noted, that while methamphetamine poses a significant risk to its users, fentanyl is unique in its lethality, and as such, its distribution

poses a significantly greater danger to the community. Therefore, based on the quantity of fentanyl attributable to the defendant, a sentence of 130 months is consistent with the cases cited above, and avoids any undue sentencing disparities.

## CONCLUSION

Based on the foregoing, the United States respectfully requests the Court to deny the defendant's motion for downward variance, and sentence the defendant to 130 months' imprisonment.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: **/s/Christopher H. Hudock**
Christopher H. Hudock
Assistant United States Attorney
Florida Bar# 92454
101 South U.S. Highway 1, Suite 3100
Fort Pierce, Florida 34950
Telephone: (772) 293-0951
Email: Christopher.hudock@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2023, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by either regular U.S. mail or inter-office delivery.

**/s/Christopher H. Hudock**
Christopher H. Hudock
Assistant United States Attorney